FILED
2004 Nov-01 AM 9:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| COMPETITION MOTOR SPORTS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. CV-03-S-2623- |
| ) | |
| AMERICAN SUZUKI MOTOR CORPORATION, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION

Competition Motor Sports, Inc., commenced this diversity action against American Suzuki Motor Corporation, alleging that an agent of the defendant "intentionally trespassed on [plaintiff's] premises to gain an unfair advantage over [plaintiff] and said trespass was attended by wantonness."[1] The case presently is before the court on plaintiff's motion for partial summary judgment on the issue of liability,[2] and defendant's motion for summary judgment.[3]

### I. FACTS

Plaintiff entered into a Dealership Agreement with American Suzuki Motor Corporation ("Suzuki") during 1989, for the purpose of becoming an authorized

---

[1] Doc. no. 1 (complaint) ¶ 8.
[2] Doc. no. 18.
[3] Doc. no. 20.



Suzuki dealer. The terms of that agreement provide, among other things, for routine inspections of plaintiff's premises by Suzuki agents. The pivotal provision reads as follows:

> **3.11 Suzuki Inspections.** Dealer will permit Suzuki agents and employees to inspect and review the Dealer's service area and records from time to time. Dealer will be aware of and discuss any and all customer problems with Suzuki's representatives from time to time.[4]

Plaintiff concedes that this provision gave Suzuki's authorized agent the right to enter and inspect its service area, but only "with prior permission"[5] and following entry

---

[4] Doc. no. 25 (plaintiff's response to defendant's motion for summary judgment) ¶ 4, at 2-3. Other provisions of the Dealer Agreement providing context for the quoted section include the following:

> **3.3 Service Area and Equipment.** Dealer shall maintain an appropriate sized service department which shall be painted, neat and properly organized to ensure efficient operation and inspire consumer confidence. Dealer shall equip this department with the appropriate and necessary shop equipment, furniture, Suzuki "Special" tools and those tools used in normal day-to-day operations.
>
> . . . .
>
> **3.6 Service Personnel.** Service personnel in the dealership will be competent and properly trained to handle all service work of Dealer's customers. . . . From time to time, Suzuki will make suggestions regarding the improvement and upgrading of Dealer's service department and personnel; however, Dealer is solely responsible for all work performed in its Service Department by its service personnel.
>
> **3.7 Special Tools.** Dealer shall purchase and maintain the special tools required by Suzuki. Dealer is aware of and accepts the need for such special tools to provide its customers fast, efficient and accurate service.

*E.g.*, doc. no. 4 (defendant's motion to dismiss), "Exhibit A" at 6-7 (emphasis in original).
[5] *Id.* ¶ 19, at 6.

through "the front door."[6] The central issue of this case is whether the Dealer Agreement provided Suzuki's agent the right to enter plaintiff's service area without first securing permission to do so, and through the roll-up door at the rear of plaintiff's dealership.

During the period following execution of the parties' Dealer Agreement and the event leading to suit, some amount of "personal unpleasantness" developed between plaintiff's owners, James Thompson and Morris Quinn, and Suzuki's District Sales Manager, James Gotham. Gotham was charged by Tom Decker, Suzuki's Southeastern Regional Sales Manager, with conducting inspections at plaintiff's dealership.

For example, Gotham did not always provide plaintiff's owners advance notice of his intention to conduct an inspection of their dealership.[7] On the other hand, prior to the incident leading to suit, Gotham always had requested permission to enter the service area upon his unannounced arrival. During Gotham's initial inspections of plaintiff's service department following execution of the Dealer Agreement, one of the owners escorted him. Over time, however, it became common practice for

---

[6] Id. ¶ 91, at 19.

[7] *Id.*, Ex. B (Deposition of James Gotham), at 54, 239. Gotham added in his deposition testimony that it is not his general practice to gain prior permission of dealers other than plaintiff when performing dealership inspections, because he "wants to see the dealership like the public sees it." *Id.* at 214.

plaintiff's owners to grant Gotham permission to inspect the facility unaccompanied.[8] On one occasion, Quinn's wife allowed Gotham to make photographs of the service department without supervision.

The event leading to this suit occurred on August 14, 2003, the date on which Gotham drove to plaintiff's dealership for the purpose of updating his photographic portfolio, and to create a contact report. As usual, Gotham did not give advance notice of his intention to conduct an inspection. Gotham arrived around two o'clock in the afternoon, and says that he drove to the rear of the dealership and parked near the service door, because all front parking spaces were filled. He lifted the unlocked, roll-up door that leads into the service area, entered the facility, and began taking photographs.

Gotham's entry was detected by a motion detector, which triggered an electronic alarm. Quinn descended the ramp to investigate. He did not immediately recognize Gotham, and asked several times that the person identify himself, and state his purpose for being in a restricted area. At first, Gotham (with his back turned to Quinn) "merely mumbled something unintelligible."[9] After he turned around and Quinn recognized him, Quinn ordered him to walk upstairs and wait while he called the police to report what he considered an illegal trespass. Gotham complied.

---

[8] Doc. no. 25 at ¶¶ 21, 23.
[9] Doc. no. 19, ¶ 13; doc. no. 24, ¶ 13.

When a police officer arrived, Gotham explained his affiliation with Suzuki and asserted a right to be in plaintiff's service area. While waiting for the officer to complete a report, Gotham telephoned Decker and informed him of the situation. Decker spoke with the officer, and confirmed both Gotham's position with the company and assertion that he had a right to be in the service area. The incident concluded when the police officer informed Gotham that a report would be filed, but Quinn had decided not to press charges.

## II. DISCUSSION

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but also that it *"shall be* rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis supplied). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*). The motion pierces the pleadings, and "strikes at the heart of the claim. In effect it argues that as a matter of law upon admitted or established facts the moving party is entitled to prevail." Charles Alan Wright, *The Law of Federal Courts* § 99, at 705 (5th ed. 1994).

When, as here, the court is presented cross motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2720, at 335-36 (1998) (footnote omitted); *see also, e.g., Arnold v. United States Postal Service*, 649 F. Supp. 676, 678 (D. D.C. 1986). The court is required

to "relate all material facts in genuine dispute in the light most favorable to the party resisting summary judgment." *Serrano-Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 24 (1st Cir. 1997) (citing *Sanchez v. Alvarado*, 101 F.3d 223, 225 n.1 (1st Cir. 1996)).

## A.  Trespass, Permissive Entry, or Entry as of Right?

Plaintiff argues that summary judgment should be entered on the issue of defendant's liability for trespass, because the parties' course of dealings had made the right of defendant's agent to enter plaintiff's premises for the purpose of conducting inspections conditional upon the agent obtaining permission to do so after arriving at plaintiff's dealership. Suzuki asserts that it is not liable for trespass as a matter of law, arguing that the parties' agreement granted defendant's agent an absolute right to enter plaintiff's dealership for purposes of inspection, even through an unlocked, rear door.[10] These arguments are based on two divergent, but equally plausible, interpretations of the language of the parties' agreement.

The existence of a contractual ambiguity is a question of law for the trial court to ascertain. *See, e.g., Reeves Cedarhurst Development Corp. v. First Amfed Corp.*, 607 So. 2d 184, 186 (Ala. 1992).[11] In making this determination, the court must view

---

[10] Doc. no. 17 (defendant's answer to complaint).

[11] This is a diversity case. *See* 28 U.S.C. § 1332. Accordingly, the court must apply state substantive law and federal procedural rules. *See, e.g., Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938); *National Distillers and Chemical Corp. v. Brad's Machine Products, Inc.*, 666 F.2d 492, 494-45 (11th Cir. 1982).

the words of the agreement with reference to their ordinary meaning. *See, e.g., Bowdoin Square, LLC v. Winn-Dixie Montgomery, Inc.*, 873 So. 2d 1091, 1098 (Ala. 2003). "An 'instrument is unambiguous if only one reasonable meaning clearly emerges.'" *Reeves Cedarhurst*, 607 So. 2d at 186 (quoting *Vainrib v. Downey*, 565 So. 2d 647, 648 (Ala. Civ. App. 1990)).

Section 3.11 of the parties' agreement provides that plaintiff "*will permit* Suzuki agents and employees to inspect . . . the Dealer's service area."[12] The phrase "will permit" is a particularly unhappy choice of words, because it creates a latent ambiguity[13] concerning the central issue: whether defendant's agent had an unconditional right to enter plaintiff's service area through an unlocked, rear door for purposes of inspection, or whether access was conditional upon permission being expressly given on each, unannounced, inspection visit. As the Supreme Court of Alabama has observed, "[h]aving *permission* or *consent* to enter upon the land, on the one hand, and having the *right* . . . to enter upon that land, are obviously inconsistent and different theories." *First National Bank of Pulaski v. Thomas*, 453 So. 2d 1313, 1319 (Ala. 1984) (emphasis supplied).

When the first word in the equivocal phrase "*will* permit" is used as a verbal

---

[12] *See supra* note 4 and accompanying text.

[13] A latent ambiguity is defined as one "that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." *Black's Law Dictionary* 88 (8th ed. 2004).

auxiliary, it expresses "frequent, customary, or habitual action." *Webster's Third New International Dictionary* 2616 (2002). The word also may be "used to express a command, exhortation, or injunction." *Id.* 2617. These definitions lend support to defendant's interpretation of the contractual language.

The second word in the infelicitous phrase "will *permit*" encompasses all of the following meanings: "to consent to expressly or formally : grant leave for or the privilege of : ALLOW, TOLERATE . . . to give (a person) leave : AUTHORIZE." *Id.* at 1683; *see also Black's Law Dictionary* 1140 (6th ed. 1990) ("To suffer, allow, consent, let; to give leave or license; to acquiesce, by failure to prevent, or to expressly assent or agree to the doing of an act."). These definitions lend support to plaintiff's interpretation of the contractual language.

In such circumstances, the court is compelled to deny summary judgment to both parties. The resolution of genuine issues of material fact concerning the parties' course of dealings prior to August 14, 2003, may provide illumination on how the parties comprehended their respective rights and responsibilities under the ambiguous terminology of their agreement. In any event, the controversy cannot be decided as a matter of law.

> If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court and, when appropriate, may be decided by a summary

> judgment. However, if the terms within the contract are ambiguous in any respect, the determination of the true meaning of the contract is a question of fact to be resolved by a jury.

*McDonald v. U.S. Die Casting & Dev. Co.*, 585 So. 2d 853, 855 (Ala. 1991). That does not end discussion, however. Before this action may proceed farther along the path leading to a trial in this court, a more fundamental issue must be addressed.

**B.  Subject Matter Jurisdiction**

The district courts of the United States are creations of Congress. *See* U.S. Const., art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."). District courts are "'empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution,' and which have been entrusted to them by a jurisdictional grant authorized by Congress." *University of South Alabama v. The American Tobacco Co.*, 168 F.3d 405, 409 (11th Cir. 1999) (quoting *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994)); *see also, e.g., Morrison v. Allstate Indemnity Co.*, 228 F.3d 1255, 1260-61 (11th Cir. 2000) ("Federal courts have limited subject matter jurisdiction . . . .") (citing *University of South Alabama*, 168 F.3d at 409-10).

Accordingly, an "Article III court must be sure of its own jurisdiction before getting to the merits" of any action. *Ortiz v. Fiberboard Corp.*, 527 U.S. 815, 831,

119 S. Ct. 2295, 2307, 144 L. Ed. 2d 715 (1999) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 88-89, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)).[14]

Here, jurisdiction is predicated on the parties' diversity of citizenship and plaintiff's bald allegation that the amount in controversy "exceeds, exclusive of interest and costs, $75,000." Doc. no. 1 (complaint), ¶ 3; *see also* 28 U.S.C. § 1332(a). Astoundingly, defendant has never challenged that assertion. Counsel should know that a defendant cannot waive federal jurisdictional requirements "by failing to challenge jurisdiction early in the proceedings." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701-02, 102 S. Ct. 2099, 2104, 72 L. Ed. 2d 492 (1982); *see also, e.g., E.R. Squibb & Sons, Inc. v. Accident & Casualty Ins. Co.*, 160 F.3d 925, 929 (2d Cir.1998) (raising *sua sponte*, after sixteen years of federal court litigation, the issue of whether diversity jurisdiction existed). This is a corollary of the axiomatic proposition that parties

---

[14] *See also, e.g., Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001) (stating that a federal court "must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises"); *Galindo-Del Valle v. Attorney General*, 213 F.3d 594, 598 n.2 (11th Cir. 2000) (observing that a federal court is "obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking."); *Fitzgerald v. Seaboard Sys. R.R., Inc.*, 760 F.2d 1249, 1251 (11th Cir.1985) ("A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises."); *Kutner v. Kutner*, 656 F.2d 1107, 1110 (5th Cir. 1981) ("[I]t is the duty of the court to determine on its own motion whether it has jurisdiction of any case before it."); *Employers Mutual Casualty Co. v. Evans*, 76 F. Supp. 2d 1257, 1259 (N.D. Ala. 1999) ("[A] federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking.").

cannot confer subject-matter jurisdiction on a federal court by consent or agreement. *See, e.g., Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701-02, 102 S. Ct. 2099, 2104, 72 L. Ed. 2d 492 (1982); *Raymon v. Alvord Independent School District*, 639 F.2d 257 (5th Cir. 1981) ("However eager the suitors may be to litigate in federal court, they cannot confer jurisdiction by consent.").[15]

Here, plaintiff "demands compensatory and punitive damages in the amount of $100,000" for defendant's alleged trespass.[16] Saying that does not make it so: "Jurisdiction is not conferred by the stroke of a lawyer's pen. When challenged, *it must be adequately founded in fact*." *Diefenthal v. Civil Aeronautics Board*, 681 F.2d 1039, 1052 (5th Cir. 1982) (emphasis supplied).

A review of the parties' evidentiary submissions does not disclose any damage to the market value of plaintiff's premises as a result of the alleged trespass.[17] Of course, as a matter of ancient policy the law infers *some* damage from an invasion of

---

[15] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[16] Doc. no. 1 complaint), at 2-3.

[17] The measure of damages for injury to real property as the result of a trespass traditionally has been defined as "the difference between the reasonable market value of the property before and after the injury. Market value is defined as the price at which a willing seller would sell and a willing buyer would buy, neither being compelled to sell or buy." Jenelle Mims Marsh & Charles W. Gamble, *Alabama Law of Damages* § 33-1, at 443 (4th ed. 1999) (footnote omitted).

a property right: the intrusion on a right to possession of real property entitles the owner to "nominal damages." *See, e.g., Fisher v. Space of Pensacola, Inc.*, 483 So. 2d 392 (Ala. 1986) (award of nominal damages appropriate where there is no proof of actual monetary loss). "Nominal damages" (which sometimes are called "*contemptuous* damages") are defined as a "*trifling sum* awarded when a legal injury is suffered but when there is no substantial loss or injury to be compensated." *Black's Law Dictionary* 418 (8th ed. 2004) (emphasis suplied).

Punitive damages *may be* awarded for a trespass, but *only when* it is established by clear and convincing evidence that the intrusion was motivated by rudeness, wantonness, recklessness, a desire to insult, fraud, malice, oppression, aggravation, or gross negligence. *See, e.g.*, Alabama Code § 6-11-20 (1975); *Stewart v. Lowery*, 484 So. 2d 1055 (Ala. 1985). There also is Alabama precedent supporting the proposition that proof of nominal damages will support a claim for punitive damages. *Cf. Carroll Kenworth Truck Sales, Inc. v. Leach*, 396 So. 2d 1044 (Ala. 1981).

Even so, for jury trials conducted after July 17, 1998, "a jury's verdict [must] specifically award either compensatory damages or nominal damages for an award of punitive damages to be upheld." *Life Insurance Co. of Georgia v. Smith*, 719 So. 2d 797, 806 (Ala. 1998) (*per curiam*), overruling *Garrett v. City of Auburn*, 623 So. 2d 1033 (Ala. 1993); *Shoals Ford, Inc. v. McKinney*, 605 So. 2d 1197 (Ala. 1992);

*Caterpillar, Inc. v. Hightower*, 605 So. 2d 1193 (Ala. 1992); *First Bank of Boaz v. Fielder*, 590 So. 2d 893 (Ala. 1991).

More importantly, the ratio of any punitive damage award to the actual harm inflicted on a plaintiff *must be* constitutionally reasonable. *See BMW of North America, Inc. v. Gore*, 701 So. 2d 507 (Ala. 1997) (*per curiam*), *on remand from* 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996) (holding that a punitive damages award may be so large as to violate the Due Process Clause of the Fourteenth Amendment).

> Where the award of nominal damages constitutes the full measure of compensation for which the defendant is, or could have been, liable, an award of punitive damages based on the award of nominal damages must withstand scrutiny under the constitutional protections available to a defendant. Questions as to (1) whether punitive damages for reprehensible conduct in the invasion of a legal right constituting nominal damage only must bear some relationship to an analogous criminal penalty, if available, (2) whether the cost of litigation could justify resort to a multiple of the criminal sanction as the standard in a proper case, or (3) whether perceived inadequacies in the amount of such penalties is a matter for redress by the legislature or the basis for a court to disregard the penalties as a useful standard, must all await determination in a case where the question is fully addressed by the parties.

*Life Insurance Co. of Georgia*, 719 So. 2d at 806-07. *See generally* Jenelle Mims Marsh & Charles W. Gamble, *Alabama Law of Damages* § 4-3 (4th ed. 1999).

The parameters of what constitutes a constitutionally "reasonable" ratio is

found by examining case law. For example, the ratio of punitive to compensatory damages grudgingly approved by the Supreme Court of Alabama after a "*Hammond-Green Oil* review"[18] of the facts in the watershed case of *BMW v. Gore*, on remand from the United States Supreme Court,[19] was 11.5 to 1: *i.e.*, the jury awarded the *Gore* plaintiff $4,000 in compensatory damages, *see* 701 So. 2d at 509; and the Alabama Supreme Court affirmed the trial court's order denying BMW's motion for a new trial on the condition that the plaintiff accept "a remittitur of [total] damages to the sum of $50,000; otherwise, the judgment will be reversed and this cause remanded for a new trial." 701 So. 2d at 515. In other words, subtracting the proven compensatory damages from the total verdict award approved by the court in order to avoid a new trial ($50,000 − $4,000 = $46,000), and dividing the remainder by the compensatory amount ($46,000 ÷ $4,000), yields a ratio of 11.5 (*i.e.*, $4,000 compensatory damages x 11.5 = $46,000 approved punitive damages, for a total approved verdict of $50,000).

Applying that same ratio to a nominal damage award of ten dollars produces an amount in controversy of only $125 (11.5 x $10 = $115 in punitive damages + $10 nominal damages = $125 total verdict award) — an amount that is far short of the

---

[18] *See Green Oil Co. v. Hornsby*, 539 So. 2d 218 (Ala. 1989), and *Hammond v. City of Gadsden*, 493 So. 2d 1374 (Ala. 1986).

[19] *See BMW of North America, Inc. v. Gore*, 701 So. 2d 507, 509-15 (Ala. 1997) (*per curiam*), *on remand from* 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996).

federal jurisdictional threshold of "$75,000, *exclusive of* interest *and costs*." 28 U.S.C. § 1332(a) (emphasis supplied). So far as this court has ever known, attorney's fees are not a recoverable item of damages in an action for trespass under either the common or statutory law of Alabama. Furthermore, the terms of the parties' Dealer Agreement do not allow plaintiff to recover attorneys' fees.[20]

In summary, this court can conceive of no circumstance under which plaintiff can satisfy the jurisdictional amount in controversy. Even so, the court shall not dismiss the action summarily, but will enter an order requiring that plaintiff show cause why this action should not be dismissed for lack of subject matter jurisdiction, but without prejudice to plaintiff's right to pursue its claim in an appropriate state forum, if it should so choose.

DONE this 1st day of November, 2004.

_____
United States District Judge

---

[20] *See, e.g.*, doc. no. 4 (defendant's motion to dismiss), "Exhibit A" ("Suzuki Products Dealer Agreement"), ¶ 10.8, at 15 ("**Attorneys' Fees**. If Suzuki sues Dealer for lack of performance, monies due, or for any other reason under the terms of this Agreement, Suki shall be entitled to reasonable attorneys' fees as determined by a court of competent jurisdiction.").